**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

| | | |
|---|---|---|
| **RANDALL RAY, INDIVIDUALLY,** | § | |
| **AND AS THE DEPENDENT** | § | |
| **ADMINISTATOR OF THE ESTATE** | § | |
| **OF TRENTON RAY, DECEASED** | § | |
| **Plaintiffs** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 6:24-cv-31** |
| | § | |
| **BROWN COUNTY, TEXAS** | § | |
| **CITY OF BROWNWOOD** | § | |
| **HENDRICK MEDICAL CENTER,** | § | |
| **HENDRICK MEDICAL CENTER OF** | § | |
| **BROWNWOOD,** | § | |
| **HENDRICK SECURITY SERVICES,** | § | |
| **SEAN LEWIS,** | § | |
| **NURSE DOE,** | § | |
| **OFFICER JAMES HOLDAR,** | § | |
| **OFFICER TY HARRELL,** | § | |
| | § | |
| **Defendants** | § | |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

1.     NOW COMES Randall Ray, Individually, and as the Dependent Administrator of the

Estate of Trenton Ray, Deceased, ("Plaintiff") and brings this Complaint and Demand for Jury

Trial against Brown County, Texas, the City of Brownwood, Texas, Hendrick Medical Center,

Hendrick Medical Center of Brownwood, Hendrick Security Services, Sean Lewis, Nurse Doe,

City of Brownwood police officer J. Holdar, and Brown County jail officer Ty Harrell

("Defendants").[1]  This is a federal civil rights and wrongful death lawsuit containing state-based medical malpractice and negligence claims.

## JURISDICTION AND VENUE

2.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1343 because the controversy arises under the U.S. Constitution and 42 U.S.C. § 1983. Plaintiff also invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) over state law claims.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims happened within this district.

## PARTIES

4.      Plaintiff Randall Ray is the father of Trenton Ray (deceased).  Randall Ray is a natural person who is domiciled in Brownwood, Texas, within the Northern District of Texas.

5.      Plaintiff Randall Ray is also the court appointed Dependent Administrator of the Estate of Trenton Ray, which was created in Brown County, Texas, where Trenton Ray resided, on April 16, 2024.

6.      Defendant Brown County, Texas, is a local government entity located within the Northern District of Texas.  This defendant may be served through Count Attorney Jennifer Broughton at 200 S. Broadway St #323, Brownwood, Texas 76801.

7.      Defendant City of Brownwood, Texas, is a local government entity located within the Northern District of Texas.  This defendant may be served through City Attorney Pat Chesser at 501 Center Avenue, Brownwood, Texas 76801.

---

[1] Once the three Hendrick hospital defendants' corporate structure is clarified, Plaintiff will amend his pleading to remove any non-essential defendants and correct any issues related to corporate structure and identity. Similarly, Plaintiff will replace the placeholder "Nurse Doe" name with the actual nurse once she is identified by her employer.

8.      Defendant Hendrick Medical Center is a not-for-profit health care institution located at 1900 Pine St., Abilene, Texas 79601.  This defendant may be served through its registered agent, Brad Holland, at that address.

9.      Defendant Hendrick Medical Center of Brownwood is a corporate subsidiary of Defendant Hendrick Medical Center and is located at 1501 Burnett Rd. Brownwood, Texas 76801.  This defendant may be served through its registered agent, Brad Holland, at 1900 Pine St., Abilene, Texas 79601.

10.      Defendant Hendrick Security Services is a corporate subsidiary of Defendant Hendrick Medical Center and is located at 1900 Pine St Abilene, Texas 79601. This defendant may be served through its registered agent, Brad Holland, at that address.

11.      Defendant Sean Lewis is an individual residing in Brownwood, Texas. This defendant may be served at 3906 Glenwood Dr., Brownwood, Texas 76801.

12.      Defendant Nurse Doe is a female individual of unknown identity with sandy-blonde hair who was employed by Defendants Hendrick Hospital and/or Hendrick Brownwood and working in the ER on the evening of the incident at issue in this case.  Plaintiff will seek discovery of Nurse Doe's identity at the first available opportunity.

13.      Defendant City Police Officer James Holdar is an individual residing in Brownwood, Texas.  This defendant may be served personally at his place of employment located at 1050 W Commerce Brownwood, Texas 76801.

14.      Defendant County Jail Officer Ty Harrell is an individual residing in Brownwood, TX. This defendant may be personally at his place of employment located at 1050 W Commerce Brownwood, Texas 76801.

15.     Defendants are persons for purposes of 42 U.S.C. § 1983.  Defendants were, at all relevant times, state actors acting under the color of state law and their acts or omissions were conducted within the scope of their official duties or employment.

## INTRODUCTION

16.     Trenton Ray was a beloved citizen of Brownwood, Texas, who died at the hands of law enforcement after he was left unsecured and allowed to walk out of the county's involuntary mental commitment screening hospital.  He had been detained for commitment screening not because he hurt anyone or caused a public disturbance—quite the opposite, in fact: Trenton was taken into custody at his own home because he was bi-polar and feeling suicidal but irrationally refusing mental health treatment.  Likewise, when police located Trenton within minutes of his hospital elopement, body camera footage shows he was docile and cooperative when being apprehended and handcuffed.

17.     However, after police then refused Trenton's plea to be taken back to the hospital's emergency room—*which was across the street*—he pulled away from police in panic and used profanity.  For this, the group of police on scene broke both of Trenton's arms at their shoulder sockets, threw him jail, and left him without medical care in a padded cell for fourteen hours.  His injuries required multiple surgeries, months of hospitalization, and eventually led to organ failure and death.  In Brownwood, the public grief and anger over these events have been palpable.  Friends, family, and concerned citizens have held protest walks through downtown to City Hall and memorial tributes to the life of Trenton Ray.

18.     Throughout this Complaint, Plaintiff has detailed the statutory regime that simplifies the issue of liability in this case, including whether certain actions or decisions on behalf of defendants were permitted or not.  As an introductory matter, however, it is worth noting that the overarching

point or legislative purpose of all these statutes "is to provide to each person having severe mental illness access to humane care and treatment." Tex. Health & Safety Code § 571.002. This admonition and goal was recognized by our state's judges who serve on the Texas Judicial Commission on Mental Health:

> "The statutes that govern the provision of mental health treatment are found in Chapters 571 – 578 of the Texas Health and Safety Code, commonly referred to as the "Texas Mental Health Code." …. It is important to remember that the purpose of the Mental Health Code is to provide persons with severe mental illness access to humane care and treatment in the least restrictive appropriate setting while also protecting their fundamental rights. Tex. Health & Safety Code § 571.002."

Judicial Commission on Mental Health, Texas Mental Health and Intellectual Developmental Disabilities Law Bench Book, p. 52 (4th ed. 2023-2025).[2]

19.     The words "humane," "care," and "treatment"—these are the tent-poles beneath which the state actors in this case operated—and they make the path to judgment in the tragic case of Trenton Ray exceedingly clear.

## FACTUAL BACKGROUND

20.     The awful story of the death of Trenton Ray began with his cry for help.

21.     Trenton Ray was a 39-year-old man from Brownwood, TX who had suffered from life-long mental disabilities and psychiatric conditions.  He lived next door to his parent's home and was employed periodically by the same mental health agency that often provided him care, the Center for Life Resources of Brownwood, Texas ("CFLR").  Trenton had always been among our

---

[2] https://www.texasjcmh.gov/media/udrktngd/4th-ed-adult-bench-book-for-web.pdf

most vulnerable members of society, which makes it especially tragic that those entrusted by our government to protect him failed him the most.

22.    Trenton began the day on May 8, 2023, consumed with depression over the loss of his mother one year prior.  Mother's Day was in a few days and Trenton, who was both autistic and bi-polar, began rapid cycling between rationality and irrationality, anger and calm, despair and acceptance.

23.    By the late afternoon, Trenton started self-medicating with alcohol and had become inebriated and suicidal by the time he reached out for help from his co-workers and care-providers at CFLR.

24.    CFLR is the Local Mental Health Authority ("LMHA") for the Texas Health and Human Services Agency in Brown County. [3]  CFLR has psychiatric mobile response caseworkers who are trained to assist in situations like Trenton's.  The emergency screening and rapid crisis stabilization service that CFLR was to perform in Trenton's case was both statutorily authorized and required, particularly because Trenton was an adult with bi-polar disorder.  See Tex. Health & Safety Code § 534.053(a) (generally) and § 533.0354(a) (specifically requiring such services for bi-polar adults).

---

[3] LMHAs serve as the point of entry for publicly-funded mental health services for people who are assessed with mental illness in Texas.  "They are responsible for recommending the most appropriate and available treatment alternative for persons in need of mental health services in accordance with the Texas Administrative Code. Each of the 39 LMHAs … is required to provide crisis-response services for all individuals in the service area and ongoing outpatient mental health services for individuals who meet diagnostic and need-based eligibility requirements."  Judicial Commission on Mental Health, Texas Mental Health and Intellectual Developmental Disabilities Law Bench Book, p. 41 (4th ed. 2023-2025).

25.     Thus, on receiving Trenton's call for help, CFLR immediately requested City of Brownwood police send an officer to Trenton's house to make a welfare check and deployed caseworker Ramuel Laureano to perform the mandatory crisis screening and assessment. See 26 Tex. Admin. Code § 306.161.

26.     Trenton lived at 1805 2nd Street, Brownwood, Texas 76801.

27.     When Mr. Laureano from CFLR arrived, he found Trenton visiting pleasantly with Brownwood Police Officer James Holdar on the front porch.  According to Laureano, Defendant Holdar had experience working with CFLR in mental crisis cases and was familiar with Trenton and his health issues.

28.     Shortly after Mr. Laureano arrived, Officer Holdar departed to let Mr. Laureano handle his crisis assessment.[4]

29.     After visiting with Trenton and observing his rapid cycling as described earlier, Mr. Laureano determined that his client needed immediate inpatient mental health care.  The problem, however, was that Trenton did not meet the criteria for CFLR's respite center and irrationally refused to go elsewhere.

---

[4] "A crisis assessment shall include an evaluation of risk of harm to self or others, presence of absence of cognitive signs suggesting delirium, need for immediate full crisis assessment, need for emergency intervention, and an evaluation of the need for an immediate medical screening/assessment by a physician (preferably a psychiatrist), psychiatric advanced practice nurse, physician assistant or registered nurse.  Id., p. 52 (citing HHSC Performance Contract, Excerpts from Information Item V, Crisis Services Standards).

30.    Mr. Laureano, therefore, phoned for Officer Holdar to return and keep an eye on Trenton while he filled out an application for an Emergency Detention Order ("EDO") pursuant to Tex. Health & Safety Code § 573.011.

31.    The emergency detention procedure under § 573.011 is the way that the civil commitment process is initiated in cases where a mental health caseworker determines that a preliminary examination and crisis stabilization are needed.  However, that caseworker's determination is not dispositive; § 573.012 of the statute then requires that a judicial magistrate meet in person with the applicant and make his or her own finding that due to mental illness and risk of harm an emergency detention is justified under Texas law.

32.    In the instant case, a local magistrate drove to Trenton's house to review the application. The magistrate met with Mr. Laureano and agreed that emergency detention was warranted under statutory guidelines and signed the following court order: "**To Officer Holdar** . . . You are hereby commanded to take Trenton Ray into **protective** custody and immediately transport him/her to Hendrick Medical Center in Brownwood in accordance with § 574.023(a) Health and Safety Code." (Emphasis added).

33.    When Officer Holdar, who had resumed visiting with Trenton on the porch, and Mr. Laureano informed Trenton that it was time to go to the hospital for treatment, Trenton refused to go and attempted to re-enter his home.  Officer Holdar intercepted Trenton and put him in handcuffs before loading him into the squad car for the trip to Hendrick Brownwood, as directed by the EDO.

34.     Trenton repeated to both men that he did not want to be hospitalized and exhibited panic about his planned involuntary commitment to the state mental hospital system.  There should have been no doubt in anyone's mind that Trenton would be a flight risk if not secluded or restrained once at the hospital, especially since he had just tried to escape into his home and needed to be handcuffed.

35.     The squad car then departed for Hendrick Brownwood, which was only 3 miles away or an 8 minute drive.  Mr. Laureano followed after first visiting briefly with Trenton's father, Plaintiff Randall Ray, who had come next door to learn what was going on.

36.     It is important to note that at this point in the narrative Plaintiff Randall Ray isn't suggesting any misconduct occurred.  Trenton clearly needed psychiatric care whether he understood so at the time or not.  Based on the facts known to date, all the statutory guidelines had been followed by the CFLR caseworker, the magistrate, and even Officer Holdar.  Events took a turn for the worse from here forward, however.

37.     Hendrick Brownwood is the largest hospital in the area until one arrives in San Angelo or Abilene (where the parent Hendrick hospital is located).  Relevant to this litigation, Hendrick Brownwood was and is the officially designated intake screening facility for the state mental hospital commitment system for area residents.  As such, the State of Texas has granted Hendrick Brownwood the authority to hold and examine EDO patients—i.e., innocent private citizens— against their will, which would be a criminal offense but for the vesting of this public function in

the hospital, making the Hendrick hospital defendants and their employees "state actors" for purposes of claims brought under 42 U.S.C. § 1983.[5]

38.    Because Hendrick Brownwood had this detention and examination authority explains why the EDO ordered Officer Holdar to take Trenton straight to that facility as the potential jumping off point for entry into the state mental hospital system.  Again this was all done pursuant to the highly detailed statutory regime found in the Texas Health and Safety Code.

39.    The magistrate's order to Officer Holdar was mandated by this statute as well.  Specifically, § 573.012(e) requires that EDO custodial warrants be issued and include language that the patient "**shall** be transported for a preliminary examination in accordance with Section 573.021 to (1) the nearest appropriate inpatient mental health facility; or (2) a mental health facility deemed suitable by the local mental health authority …".  Tex. Health & Safety Code § 573.012(e) (emphasis added).  Thus, Hendrick Brownwood was the correct and mandatory destination for Trenton, both by statute and by court order.

40.    Even police officers who encounter non-criminal, mentally ill individuals on their own and determine as best they can that a person may harm themselves are not allowed to take them to jail, "except in an extreme emergency." Tex. Health & Safety Code § 573.001(e).  In cases like

---

[5] "[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton,* 382 U.S. 296, 299, 86 S. Ct. 486, 488, 15 L. Ed. 2d 373 (1966).  This includes private detention facilities. *Rosborough v. Management Training Corp.,* 350 F.3d 459 (5th Cir. 2003); *Meade v. Bonin,* No. CV 20-1455, 2020 WL 5311351, at *4 (E.D. La. Sept. 4, 2020) (even an ankle monitoring company held to be a state actor). There is no question this applies to medical facilities and care. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding that a private physician who contractually assumed a state's Eighth Amendment duty to provide medical care to inmates "must be considered to be a state actor" when undertaking that obligation).

Trenton's, however, where an actual judge has made the determination, even that highly restricted decisional latitude is off the table for police. At no point did Officer Holdar ever have discretion to jail Trenton Ray.

41.    Before detailing what actually happened once Trenton arrived at Hendrick Brownwood, let's discuss what the Texas Legislature envisioned would happen. Taking innocent citizens into state custody for mental health reasons understandably comes with serious and specific statutory obligations and duties toward the custodial patient on behalf of both the police and the state's designated intake screening facility.

42.    As noted, Officer Holdar was required by statute and court order to take Trenton to the state's intake screening facility, Hendrick Brownwood. Once at the facility, Officer Holdar was arguably required to stay until Trenton's screening was complete but, in any event, at least until he was taken "into custody" by the hospital. Texas Health & Safety Code § 573.012(d-1).[6] Given that Trenton had just tried to escape minutes earlier by re-entering his home and had to be handcuffed, Officer Holdar and hospital personnel knew or should have known that "into custody" meant Officer Holdar should stay until the hospital had safely secluded or restrained Trenton.

43.    Hendrick Brownwood, as the state designated intake screening facility for Brown County, had a non-discretionary statutory duty to accept Trenton as a patient. Texas Health & Safety Code § 573.021(a). It had a non-discretionary statutory duty to perform a preliminary examination within 12 hours of Trenton arrival. Texas Health & Safety Code § 573.021(c). In fact, as these

---

[6] Texas Health & Safety Code § 573.012(d-1), which allows police officers to depart once an EDO patient is in the hospital's "custody" did not become effective until September 1, 2023. The law in effect for this case was silent as to whether police needed to stay through screening.

functions do not depend upon or allow medical judgments made by private parties according to professional standards, there was yet another nexus of state control and involvement needed to make the Hendrick defendants and their employees state actors for 42 U.S.C. § 1983 purposes.

44.    Assuming Trenton had been examined and found to meet the requisite commitment criteria, he then had the right to be safely transported from Hendrick Brownwood to the state mental hospital. See Texas Health & Safety Code § 573.025 (6).

45.    Returning to the timeline, however, we see that *none of this happened.*

46.    When Mr. Laureano arrived at Hendrick Brownwood's emergency room, Officer Holdar still had Trenton restrained in handcuffs because he was not in his right mind and a flight risk. Trenton was rapid cycling, in an escalated psychiatric state, and while alive had little to no memory of being at the hospital at all or eloping from it.

47.    An employee of Henrick Security Services, Security Official Sean Lewis,[7] and Nurse Doe were visiting with both men directly in front of the ER nurses' station which was staffed by hospital personnel.  Security Official Lewis also knew Trenton, understood he had mental issues, and was trying to calm him down.  At this point, Lewis, Nurse Doe, and the other ER staff on duty were aware that Trenton, who had been forcibly brought to the hospital in handcuffs, was at risk to elope and hurt himself if not immediately restrained, especially once police departed.

---

[7] Hendrick Security Services is the division of the hospital in charge of patient, employee, and visitor security.  According to online information, Hendrick Security employs thirty (30) security personal between two difference hospitals and maintains separate insurance and Texas Commission on Law Enforcement ("TCOLE") licensing for these employees.

48.     After a few minutes Trenton cycled into a calmer-seeming state, according to Laureano. This would have been the ideal time to have led Trenton to a secure, locked room or area used for holding mental patients in a safe environment (i.e., to "seclude" him).  Hendrick Brownwood, in fact, had such holding or seclusion areas on premises.  On information and belief, one or more of these rooms were available at that time.

49.     Instead, Officer Holdar uncuffed Trenton in the ER admissions lobby and warned him that should he elope from the hospital that Officer Holdar would arrest him for public intoxication.  At this point, Security Official Lewis, Nurse Doe, and other ER personnel within earshot of this threat understood that Trenton was also at specific risk of being hurt by police should he elope—at the very least, they knew or should have known that placing a patient in Trenton's condition in jail would deprive him of the medical and psychiatric care he desperately needed.

50.     The over-arching point to remember here is that Trenton was a mental patient who was in custody because he was having a suspected psychiatric emergency—he was not in the state of mind to act rationally or be reasoned with because, if he had been, there would have been no basis for involuntary commitment in the first place.  As noted in the opening, Trenton needed protection and care, yet the people who were employed to provide that fatally failed Trenton, over and over again.

51.     Security Official Lewis, Nurse Doe, and other ER staff did not object to Officer Holdar removing restraints from Trenton nor, according to witness accounts, did they request that Officer Lewis assist them in applying readily available hospital restraints or by escorting Trenton to a locked seclusion room.

52.     Between Nurse Doe, the ER nursing station, and Security Official Lewis, the plan was hatched to require Trenton to walk with Lewis and Laureano across the hospital to the main admissions desk and check in like someone who was there for a *doctor's appointment*. This was not just unreasonable and reckless, it was insane. Anyone that's ever been to an ER knows that emergency check-in gets handled right there, so why would Hendrick Brownwood and Hendrick Security employees make an involuntarily committed mental patient walk across the hospital unrestrained to go through a normal check-in process? That was unsafe for Trenton and, quite frankly, unsafe for other patients and their families.

53.     There are conflicting accounts of whether Officer Holdar departed at this point or remained. Mr. Laureano recalls that Holdar left, but other eyewitnesses contend he was present when Trenton came back into the ER from another part of the hospital, as described below, and only left shortly thereafter while Trenton was arguing with hospital personnel about leaving.

54.     In either event, it was unreasonable and reckless for Officer Holdar to depart prior to the hospital securing Trenton in restraints or placing him in seclusion.

55.     For the same reasons, it was likewise unreasonable and reckless for Security Official Lewis, Nurse Doe, and other hospital personnel to accept Trenton into their care unrestrained and unsupervised by police. Properly trained and supervised security and medical personnel would not have allowed this unreasonable and reckless action to occur.

56.     This became especially true when Trenton announced he was leaving the hospital and headed for what he thought was an exit. Trenton was disoriented and confused, however, because instead of exiting, he walked through doors leading into the heart of the hospital. As Security

14

Official Lewis and Mr. Laureano caught up with him, the rational action would have been to detain him there and summon orderlies to help secure their mental patient.

57.    Another option would have been sending a nursing station employee to find Officer Holdar, whether he was still near the nurse's station or had headed out to the parking lot.  Common sense and reasonableness did not prevail, however.

58.    Instead, Security Official Lewis told Trenton he was not allowed to be in that part of the hospital and inexplicably directed him *back* to the ER admissions room and its unsecured exit.

59.    Once back in ER admissions, eyewitnesses report that Security Official Lewis, Nurse Doe, and Laureano argued with Trenton about leaving yet did nothing to restrain him.  After a few more minutes, everyone present ultimately watched Trenton Ray walk out of the unlocked ER exit door and into the night.

60.    Hendrick Brownwood and Hendrick Security staff let this happen knowing full well that Officer Holdar had just threatened to jail Trenton in violation of the EDO and universally understood standards of medical care that require hospitalization for people in his condition. Instead of following the patient restraint policies published on the hospital's own website, which allow hospital personnel to physically restrain patients against their wishes, hospital personnel negligently and recklessly decided to let Trenton be taken to jail or worse.

61.    Security Official Lewis and Mr. Laureano then followed Trenton outside and jumped into a vehicle.  They tailed Trenton and called police dispatch despite knowing that Officer Holdar had just threatened to jail Trenton if he left his detention.  Security Official Lewis was negligent and

reckless to assist the police in recapturing and jailing Trenton; indeed, without his decision to re-summon Officer Holdar and his action in supplying Trenton's location the following would not have occurred.

62.     Minutes after leaving the hospital, Officer Holdar returned and recaptured the eloped patient.  Body camera footage shows Officer Holdar and a new cop, Officer Carlisle, handcuffing Trenton without resistance from a row of small buildings directly across the street from the hospital ER.

63.     The officers told Trenton he was under arrest and would be going to jail for public intoxication, as threatened.  Trenton pleaded to be taken back to the hospital but was told by Officer Holdar that "he had his chance" and now would be going to jail despite the EDO and despite Officer Holdar knowing that the only reason Trenton was in public was because he had forcibly placed the patient there.  Any reasonable law enforcement official would have known that these actions violated a myriad of clearly established constitutional and statutory laws.

64.     The EDO was still in effect and Officer Holdar was not allowed to take Trenton to jail, he had to deliver him back to Hendrick Brownwood.  Not following a court order directed specifically to him *by name* was not just unreasonable, it was reckless and defiant.  Especially because every single reason that Trenton needed emergency psychiatric help in the first place had by now only gotten worse.

65.     Furthermore, the only reason Trenton was now allegedly drunk in public was because Officer Holdar had forcibly removed him from his home and hauled him into a public place.  Every

reasonably well-trained cop knows that this type of stunt is a clearly established civil right violations.[8]

66.    Trenton then became agitated and upset. He yelled profanities at the police officers as they walked him toward the squad car. He became uncooperative in walking. Nonetheless, the two officers successfully propelled Trenton toward the vehicle.

67.    A third cop, Officer Acosta, joined the arrest at this point, as did Security Official Lewis who jumped in and grabbed Trenton, according to police and Mr. Laureano.

68.    Officer Holdar's police report states that during this process Officer Holdar pulled Trenton's handcuffed arms upwards behind his back. What the report does not state is that he did so with such force that it broke both of Trenton's arms at the shoulder.

69.    When this happened, Trenton started screaming that he was injured and in severe pain, but the team forced him down to the ground and into a total body restraint that worsened Trenton's injuries and pain. Eyewitnesses have reported hearing Trenton's screaming from near the ER doors. The officers then heaved Trenton into the squad car for transport to jail.

---

[8] Officers cannot forcibly remove citizens from their home into a public place and then claim the "in public" element of a crime is met. "Plaintiff alleges that he was in his doorway and on his porch until he was thrown off of the porch by one of the [police] defendants. Accepting these allegations as true, no reasonable officer could have concluded that Plaintiff was "upon the public streets or rights-of-way" in violation of the curfew law. Thus, Plaintiff has sufficiently alleged that the officers lacked probable cause to arrest him for violation of that law." *Thomas v. City of Galveston, Texas,* 800 F. Supp. 2d 826, 834 (S.D. Tex. 2011)

70.     Again, this tragedy took place bathed in the floodlights of a hospital ER, yet no one thought twice about taking this poor man back across the street for either (1) his now worsening mental health crisis or (2) his freshly broken arms.  This was unreasonable, reckless, and inhumane.

71.     Trenton Ray arrived at the Brown County jail around 9:30 pm according to jail records.

72.     Jail video footage shows county jail official Ty Harrell meeting Trenton on arrival and supervising his intake, assisted by what appear to be two trainee-level employees.

73.     These county employees had been informed that Trenton was an eloped mental patient from Hendrick Brownwood that had been arrested for public intoxication and resisting arrest.  Yet, none of them, including Harrell, inquired about why Trenton was not taken back to the hospital.

74.     More tellingly, when they observed Trenton's severely injured, oddly danglingly arms and heard him repeatedly cry out in pain, none of them inquired about how he got hurt or even acknowledged the injury in any way—and especially not in writing.

75.     Instead, Harrell ordered employees to complete a mental health intake questionnaire.

76.     Next, the three jailers made Trenton disrobe and shower.  This is painful to watch on video because Trenton could not use his arms and continually cried out in agony.  Officer Harrell and his two assistant jailers had to pull off Trenton's clothes and even get soap from the wall-mounted shower soap dispenser for him since his arms would not lift up to work the device.

77.     Instead of seeking medical help, they put Trenton in a padded cell with no toilet on round-the-clock suicide watch.  Jail documentation contains voluminous notes of officials looking in on

18

him every 10-15 minutes all night long—in other words, Defendant Harrell and other county jail personnel coldly watched a man suffer nonstop, all night long and did nothing.

78.     Even worse, despite the constant attention, Trenton was kept in a severely dehydrated condition all night long, despite begging for water.  This, along with elevated levels of pain and trauma-related bodily secretions, severely damaged his kidneys and worsened his shoulder injuries.

79.     Under Officer Harrell's supervision, no medical treatment or assessment was offered or performed despite Trenton's obvious injuries.

80.     It wasn't until the jail's morning shift arrived at 8:00 am the next day that anyone acknowledged that Trenton's arms had swollen up to twice their normal size, were discolored, and that he was sobbing in pain and begging for help.

81.     In summary, Officer Harrell and his two subordinates saw Trenton completely nude with obvious injuries during intake and then had Trenton under observation every fifteen minutes moaning in his cell, begging for help and water.  But for fourteen hours, no medical treatment whatsoever was provided, and it would be twenty-two hours before Trenton got anything more than his pulse checked.

82.     During all of that time no one made a single note about Trenton's injured arms.  This was not an oversight, it was a coverup.

83.     The only explanation that makes any sense at all is that the cops at the jail were determined to wait out the injury as long as possible in order to hide the excessive force used by the arresting

cops.  Given his supervisory position and direct involvement in processing Trenton, the order to withhold medical treatment and thereby avoid creating documentation of injury must have come from Officer Ty Harrell.  Harrell and his team were apparently hoping that Trenton would just get better and by the time he left jail there would be no record that he was hurt during his arrest.

84.    Sadly, Trenton did not get better.  One of the morning shift officer's notes states: "At approximately 1105AM Chief Caffey came to me and said, "I think we need to send him to the ER.""

85.    Finally, Trenton left jail in ambulance bound back to Hendrick Brownwood's ER—where he should have been all along—at 11:30 am the next day.

86.    Trenton spent the next three months in the intensive care unit, first at Hendrick Brownwood and then at Hendrick Medical Center of Abilene.  Not only did he need multiple surgeries on his arms, but the shock and trauma of his untreated injuries caused his kidneys to fail, and he began dialysis.

87.    This kidney failure in turn damaged Trenton's other organs, including his liver, and was ultimately to prove fatal less than a year later.

88.    Being in Abilene was especially hard on Trenton and his father, Plaintiff Randall Ray. Trenton was isolated from his family and friends who lived an hour away in Brownwood and, given his mental health issues, this caused pronounced mental anguish.  His father, for his part, was consumed with worry, anxiety, depression, and emotional distress.

89.     After being hospitalized from early May through July, Trenton came home for approximately five months beginning in late August of 2023, during which time he still faced criminal charges for both public intoxication and resisting arrest.  The charges were finally dropped when undersigned counsel traveled to Brownwood to appear at a pre-trial meeting with prosecutors.

90.     Sadly, and as noted before, Trenton's injuries caused continued organ failure that required re-hospitalization at Hendrick Medical Center of Abilene on or about February 8, 2024.  He died five days later on February 13, 2024.

### Municipal, County, and Hospital Responsibility

91.     Trenton Ray's injury and death would have not occurred but for the failure of Brown County, the City of Brownwood, and state emergency detention personnel (the Hospital defendants) to supervise and train their employees on emergency detention order requirements and best practices.

92.     For these employers, there was a failure to train and supervise employees on how to follow EDO warrants and what to do when their co-workers or others have not.

93.     There appears to have been zero relevant training or supervision on this topic for law enforcement because both the Brown County Sheriff's Department and the Brownwood Police Department were sent Texas Public Information Act Requests asking for "all documents and information establishing or explaining procedures to be followed by employees when people are brought to the hospital by your officers pursuant to Emergency Detention Orders."

94.     The Sheriff himself responded to the request by stating cryptically that, "We cannot confirm or deny that the document you requested exists.  However, it is not in our possession." A follow up email with the Sheriff's public information officer confirmed that he was talking about all of the documents requested.  Based on this response—that there was not a single document in the entire Sheriff's Department related to EDOs—it is more than plausible that there has been a complete absence of training and supervision on this issue.

95.     The City of Brownwood police department public information officer likewise produced nothing relevant.  The city police provided undersigned counsel with a three-page policy paper on transporting *prisoners.*  Is the City of Brownwood training its police force to treat mental patients like criminal suspects and prisoners?  If so, this would explain Officer Holdar's decision-making in this case.  In any event, it appears that either no training or supervision in the EDO context existed within the city police force or completely backwards training and supervision were engaged in.

96.     Finally, Plaintiff even asked for the same information from CFLR, but they also could not provide or point to any agreed upon set of practices for the treatment of EDOs among the defendants in this case.  Moreover, in a recent interview, CFLR caseworker Laureano made it clear that he, Officer Holdar, and Hospital Security Official Lewis were not aware of or operating under any formal protocol or plan when dealing with Trenton.  Laureano expressed confusion about even the most basic protocols, such as whether police needed to follow an EDO if a mental patient eloped during hospital intake.  Obviously, this is a genuine problem for the city, the county, and the multi-county area services by CFLR.

97.    The failure to plan and train on the part of local government officials also impacted Hendrick Brownwood.  Operating as the EDO medical-clearance facility for the state mental hospital system, the hospital and its security service company clearly had no protocols in place for EDO patient safety and security either.  Had the city or county been supervising and training its own personnel, it seems extremely unlikely that the hospital defendants would have been so clueless and negligent in how they handled an EDO patient.  This was a systemic failure on the part of state and local actors.

98.    In addition to the foregoing, Brown County and the Hendrick hospital defendants clearly lacked official policy, training, and supervision regarding what to do when arresting officers disobey EDO directives from local judges and magistrates.  Instead of alerting supervising officers in county and city law enforcement, the night shift at the jail and hospital immediately pretended that the arrested patient wasn't physically injured in order to protect arresting officers from excessive force claims.  While this code of silence is a well-known problem throughout law enforcement, it is disturbing that hospital personnel were observing it as well.

99.    Based on the foregoing, Plaintiff Randall Ray brings the following causes of action against Defendants in this case:

- **COUNT I:**         False arrest in violation of the 4th Amendment.

- **COUNT II:**        Use of excessive force in violation of the 4th Amendment.

- **COUNT III:**       Denial of medical care in violation of the 14th Amendment

- **COUNT IV:**       Medical malpractice.

- **COUNT V:**        Negligence

- **COUNT VI:**        Premises liability
- **COUNT VII:**       Wrongful Death
- **COUNT VII:**       Survival

## DAMAGES

100.    As a result of Defendants' conduct, Trenton Ray incurred medical bills, lost functioning arms, needed round the clock care, was disfigured, lost wages and income, experienced extreme physical pain and suffering, and felt profound mental anguish and emotional distress, only to then die approximately 9 months after his assault.  Plaintiff Randall Ray, as more completely detailed in his wrongful death claim below, experienced the same or similar emotional distress and mental anguish, along with the loss of his son's companionship and care.

## TRIAL BY JURY

101.    Plaintiff is entitled to and hereby demands a trial by jury.  U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## COUNT I

False Arrest in violation of
the Fourth Amendment
(42 U.S.C. § 1983)

102.     Plaintiff incorporates and re-alleges the above allegations in full.

103.    This claim is brought against the City of Brownwood, Officer Holdar, and the three Hendrick hospital defendants.

104.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable seizure by law enforcement officers.

24

105.    It was clearly established at the time of Trenton Ray's arrest that the Fourth Amendment prohibits arrest without probable cause.

106.    The police officers arrested Trenton Ray without probable cause. The lack of probable cause would have been evident to any reasonable person based on the facts and circumstances within the officers' knowledge at the time. The officers did not witness Trenton Ray break any law, nor did they have any reason to believe that he had broken any law.

107.    As noted earlier in the Complaint, police are not allowed to physically remove citizens from their own homes, take them to a public place, and then arrest them for public intoxication.

108.    The three Hendrick hospital defendants are likewise liable for this constitutional violation because Security Official Sean Lewis actively participated in calling the police back to the scene after being told they intended to violate the Fourth Amendment, tracking Trenton Ray down for the police, and physically assisting in the false arrest of Trenton Ray.

109.    Lack of probable cause has been further evidenced by prosecutors' decision to drop all charges against Trenton Ray prior to his death.

110.    The above misconduct violated Trenton Ray's clearly established Fourth Amendment rights.

111.    Any reasonable police officer or government official would have known that arresting Trenton Ray under these circumstances would violate his clearly established constitutional rights.

112.    The individual defendants are not entitled to qualified immunity for their conduct, because their mistreatment of Trenton Ray violated his clearly established constitutional rights and was objectively unreasonable.

113.    As a direct and proximate result of this misconduct, Trenton Ray suffered actual physical, emotional, and economic harm, including death.

114.    Plaintiff is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

115.    Plaintiff is also entitled to punitive damages against each defendant under 42 U.S.C. § 1983 because their actions were malicious, willful, or made with reckless or wanton disregard of Trenton Ray's constitutional rights.

## COUNT II

Excessive force in violation of the Fourth Amendment
(42 U.S.C. § 1983)

116.    Plaintiff incorporates and re-alleges the above allegations in full.

117.    This claim is brought against the City of Brownwood, Officer Holdar, and the three Hendrick hospital defendants.

118.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable seizure by law enforcement officers.

119.    It was clearly established at the time of Trenton Ray's arrest that the Fourth Amendment prohibits law enforcement officers from using an unreasonable level of force during an arrest. Specifically, it had been clearly established in the Fifth Circuit for well over a decade that police may not abuse handcuffed arrestees, like Trenton Ray. *Bush v. Strain,* 513 F.3d 492, 502 (5th Cir. 2008).

120.    By handcuffing Trenton Ray and *then* lifting his arms backwards until his arms broke at the shoulder, defendants violated his clearly established Fourth Amendment rights.

121.    The level of force used by the police against Trenton Ray was objectively unreasonable because: (a) the offense(s) that Trenton committed were minor and ultimately dismissed by prosecutors; (b) Trenton was handcuffed, and objectively posed no threat to the police, and (c)

Trenton did not resist arrest in such a way as to justify the amount of force chosen by the arrest team.

122.    It was also unreasonable to put Trenton Ray into a full body restraint device when he had broken arms and when a hospital emergency room was directly across the street.  If nothing else, Trenton should have been taken for readily available medical clearance and treatment first.

123.    Any reasonable law enforcement officer would have known that using this level of force both during and after the arrest of Trenton Ray would violate his clearly established constitutional rights.

124.    The defendants are not entitled to qualified immunity for their conduct, because their use of force against Trenton Ray violated his clearly established constitutional rights and was objectively unreasonable.

125.    The three Hendrick hospital defendants are likewise liable for this constitutional violation because Security Official Sean Lewis actively participated in calling the police back to the scene after being told they intended to violate the Fourth Amendment, tracking Trenton Ray down for the police, and physically participating in the apprehension and assault on Trenton Ray.

126.    As a direct and proximate result of defendants' excessive force, Trenton Ray suffered actual physical, emotional, and economic harm, including death.

127.    Plaintiff is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

128.    Plaintiff is also entitled to punitive damages against each defendant under 42 U.S.C. § 1983 because their actions were malicious, willful, or made with reckless or wanton disregard of Trenton Ray's constitutional rights.

## COUNT III

Denial of medical care in violation of the Fourteenth Amendment
(42 U.S.C. § 1983)

129.    Plaintiff incorporates and re-alleges the above allegations in full.

130.    This claim is brought against all defendants.

131.    The Fourteenth Amendment of the U.S. Constitution protects citizens against law enforcement officers who injure citizens and then deny medical care. It also applies in detention settings involving other types of state actors.

132.    At the time of Trenton Ray's arrest, it was clearly established under the Fourteenth Amendment that the "right of a pretrial detainee to medical care .... is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries." *Allen v. Hays,* 65 F.4th 736, 747 (5th Cir. 2023). Specifically, denying medical care in situations where serious medical harm and injuries have occurred was a "clearly established" constitutional violation even when the period of denial was 6 minutes (see *Id.* at 747) and 10 minutes (see *Cope v. Cogdill*, 3 F.4th 198, 203 (5th Cir. 2021).

133.    First, the hospital defendants violated their manifest statutory duties as a state intake screening facility to provide required health care to Trenton Ray during his emergency detention at Hendrick Brownwood. They failed to accept him as a patient. They failed to safely secure him. They failed to provide him with his preliminary examination. Instead, they participated in hunting him down and hurting him and did nothing afterwards to provide medical assistance when hospital leadership could have easily contacted county and municipal leaders to alert them of Trenton's injuries and his need for immediate medical attention.

134.    Next, regarding the other defendants, Trenton Ray was denied medical treatment and appropriate care for approximately twenty-two hours.

135.    The arresting officers broke Trenton's arms immediately outside of a hospital ER and heard Trenton yelling and sobbing in pain yet refused him the immediately available and easy to access medical treatment he needed.

136.    The jail officials were told and/or understood that arresting officers had injured Trenton Ray and attempted to conceal that by refusing to document or treat his injuries.  They too observed Trenton yelling and sobbing in pain, they saw his bruised, swollen, and oddly dangling arms.  They were told by Trenton that he was hurt.

137.    All law enforcement defendants thus were aware of facts from which an inference of a substantial risk of serious harm to Trenton Ray could be drawn and they actually drew the inference.

138.    Any reasonable law enforcement officer would have known that denying proper and immediate medical care to Trenton would violate his clearly established constitutional rights under these circumstances.

139.    These defendants are not entitled to qualified immunity for their conduct, because the denial of medical care violated Trenton's clearly established constitutional rights and was objectively unreasonable.

140.    As a direct and proximate result defendants' unlawful denial of medical care, Trenton Ray suffered actual physical, emotional, and economic harm, including death.

141.    Plaintiff is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

142.    Plaintiff is also entitled to punitive damages against each defendant under 42 U.S.C. § 1983 because their actions were malicious, willful, or made with reckless or wanton disregard of Trenton Ray's constitutional rights.

## COUNT IV

Medical Malpractice
(Texas Medical Liability Act)

143.   Plaintiff incorporates and re-alleges the above allegations in full.

144.   These state law claims are brought against Hendrick Medical Center, Hendrick Medical Center of Brownwood, and Hendrick Security Services.

145.   Plaintiff brings this action against defendants for medical malpractice under the Texas Medical Liability Act, Sections 74.001 et seq. of the Texas Civil Practice and Remedies Code.

146.   On October 13, 2023, Trenton Ray gave written notice of the claim on which this suit is based by certified mail, return receipt requested, as required by Section 74.051(a) of the Texas Civil Practice and Remedies Code.  The notice included an authorization form for release of protected health information as required by Section 74.052 of the Texas Civil Practice and Remedies Code. A copy of the notice and authorization is attached as "Exhibit 1" and is incorporated by reference. Therefore, Plaintiff has met all statutory conditions precedent to bringing this action.

147.   On May 8, 2023, Trenton Ray was brought to Hendrick Medical Center of Brownwood for medical clearance from this defendant for his admission to a state-run or state-approved inpatient mental hospital.

148.   Defendants were negligent and grossly negligent in the care and treatment of Trenton Ray, including, but not limited to, the following particulars:

   a.   Failing to appropriately examine and assess Trenton Ray's condition;

   b.   Failing to appropriately secure or restrain Trenton Ray;

30

   c.   Failing to timely notify law enforcement supervisors that patrol officers injured Trenton Ray;

   d.   Failing to timely notify law enforcement supervisors that patrol officers took Trenton Ray to jail instead of returning him to the hospital;

   e.   Failing to put internal and external operational protocols and procedures in place for the treatment and safety of mental patients brought to the hospital pursuant to Emergency Detention Orders;

   f.   Assisting law enforcement efforts to locate, arrest, and jail Trenton Ray in violation of a court order.

   g.   Physically participating in law enforcements excessive use of force against Trenton Ray;

   h.   Failing to adequately train and/or supervise employees in emergency psychiatric patient safety and care;

   i.   Any other acts and omissions of negligence that may be uncovered during the discovery of this matter and be shown at the time of trial.

149.   The negligence and gross negligence described above was a proximate cause of Trenton Ray's injuries, for which Plaintiff sues.

150.   As a direct and proximate result of defendants' negligence and gross negligence as described above, Trenton Ray sustained the following injuries: two broken shoulders, confinement overnight in jail with inadequate hydration and no medical treatment or pain relief, kidney failure, liver/renal failure, psychiatric trauma, and death.

151.   As a direct and proximate result of the negligence and gross negligence of defendants, as described above, Trenton Ray incurred damages, within the jurisdictional limits of this court, including the following: loss of use of his arms, prolonged hospitalization, pain, mental anguish,

quality of life loss, invasion of privacy, false arrest, false prosecution, reputational injury, economic loss (lost income and medical bills), and death.

## COUNT V

### Common law negligence and gross negligence

152.    Plaintiff incorporates and re-alleges the above allegations in full.

153.    This claim is brought against Hendrick Security Services and Sean Lewis.

154.    These claims are identical to those articulated in Count IV above, except that they exist under common law instead of the Texas Medical Liability Act.

## COUNT VI

### Premises Liability

155.    Plaintiff incorporates and re-alleges the above allegations in full.

156.    This alternative claim is brought against Hendrick Medical Center and Hendrick Medical Center Brownwood.

157.    In the alternative that failing to secure or seclude Trenton Ray is deemed custodial, routine, or non-medical, Plaintiff brings a premises liability against these defendants for the same.

158.    Trenton Ray, a mental patient, was an invitee while at Hendrick Brownwood.

159.    Defendants used their emergency room reception and waiting area as a holding area for EDO patients waiting for their statutory preliminary medical examination.

160.    There were either no automatically locking doors for this area that would prevent EDO patients from exiting the holding area or defendants failed to engage them creating a known dangerous condition for Trenton Ray and patients like him.

161.    As a direct and proximate result this premises defect, Trenton Ray suffered actual physical, emotional, and economic harm, including death.

162.

## COUNT VII

### Wrongful Death
### (Texas Wrongful Death Statute)

163.    Plaintiff incorporates and re-alleges the above allegations in full.

164.    This claim is brought against all defendants.

165.    This action is brought pursuant to Chapter 71 of the Texas Civil Practice & Remedies Code.

166.    Randall Ray is an individual plaintiff and is the Dependent Administrator of the Estate of Trenton Ray, deceased. Plaintiff would show that as a direct and proximate result of the above wrongful conduct of the Defendants, Trenton Ray sustained injuries and damages which ultimately resulted in his painful and agonizing death on or about February 13, 2024.

167.    Plaintiff would show that as a direct and proximate result of the wrongful conduct of the Defendants, which brought about the death of a loving son, that Plaintiff has suffered the past and future loss of Trenton Ray's love, care, maintenance, support, services, advice, counsel, companionship, and society, and will suffer past and future emotional pain, mental anguish, torment, and suffering as a result of the untimely and wrongful death of his son, Trenton Ray.

33

These damages were suffered in the past and will be suffered in the future for the rest of his life. Plaintiff seeks past and future pecuniary loss, punitive damages, past and future loss of companionship and society, and past and future mental anguish.

## COUNT VIII

Survival
(Texas Survival Statute)

168.    Plaintiff incorporates and re-alleges the above allegations in full.

169.    This claim is brought against all defendants.

170.    This claim is brought pursuant to Chapter 71 of the Texas Civil Practice & Remedies Code.

171.    Plaintiff Randall Ray is the Dependent Administrator and representative for the estate of Trenton Ray.

172.    Trenton Ray died as a result of the defendants' wrongful conduct.

173.    Trenton Ray would have been entitled to bring this action against defendants if he had lived.

174.    The decedent's rights of action for the wrongful conduct against defendants survive in favor of heirs, legal representatives, and the estate of the deceased.

175.    Defendants are liable to Plaintiff for the loss of Trenton Ray's life, pain and suffering, mental anguish, and the violation of his civil rights.  Plaintiff seeks compensation, including punitive damages, as set forth more specifically in the section of this Complaint entitled "Damages" and within the damages clause for each of the other causes of action pled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of the Defendants, and award the following relief:

34

A.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, other pain and suffering and death on all claims allowed by law in an amount to be determined at trial;

B.    Compensation for economic losses on all claims allowed by law in an amount to be proven at trial;

C.    Punitive damages on all claims allowed by law in an amount to be determined at trial;

D.    Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

E.    Pre- and post-judgment interest at the lawful rate; and

F.    Any other relief that the Court deems just and proper.


Dated this 9th day of May 2024.

Respectfully submitted,

By: s/Kevin D. Green_____
Kevin D. Green
*Attorney-in-Charge*
Texas Bar No.: 00792544
**LAW OFFICE OF KEVIN D. GREEN**
7960 Mesa Trails Cir
Austin, TX 78731
Telephone: (512) 695-3613
kevin@consumerjusticecenter.com

Thomas J. Lyons, Jr., Esq.
Attorney I.D. #249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Facsimile: (651) 704-0907
tommy@consumerjusticecenter.com
*(Pro Hac Vice to be filed)*

***ATTORNEYS FOR PLAINTIFF***


**CERTIFICATE OF SERVICE**

On May 9, 2024, I filed the foregoing document with the clerk of the court for the U.S.

District Court, Northern District of Texas.  I hereby certify that I am serving the document on all

counsel or parties of record in a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

s/Kevin D. Green

**THE LAW OFFICE OF KEVIN GREEN**

*Austin Office: 7960 Mesa Trails Cir.*
*Austin, TX 78731*
*Telephone: (512) 695-3613*
*Email Address: kevin@consumerjusticecenter.com*

October 13, 2023

**<u>NOTICE OF INTENT</u>**

**TO INITIATE LITIGATION FOR MEDICAL MALPRACTICE**

Dear General Counsel for Hendrick Health:

We represent Mr. Trenton Ray who resides in Brownwood, Texas. We are writing pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code. Please consider this letter a formal notice of Mr. Ray's intent to initiate litigation for medical malpractice against Hendrick Health related to injuries sustained by Mr. Ray in connection with his emergency detention at Hendrick Medical Center Brownwood ("the Hospital") on May 9, 2023.[1] The Hospital's lack of care and treatment that day resulted in permanent injuries to Mr. Ray as well as substantial emotional and economic damages. The following is a short overview of the malpractice that occurred:

Mr. Ray arrived at the Hospital in handcuffs at approximately 9:00 pm in the company of Brownwood Police Department Officer J. Holdar and a caseworker from Center for Life Services in Brownwood (MHMR). Your staff, including security officer Sean Lewis were told that Mr. Ray was brought in pursuant to an Emergency Detention Order because he was suicidal and a grave danger to himself. Your staff was informed that Mr. Ray was bi-polar and off his

---

[1] Mr. Ray was subsequently re-admitted to the Hospital on May 10, 2023. We are not presently aware of any malpractice claim based on the care Mr. Ray received from that date onward. This Notice, thus, concerns acts and omissions occurring on May 9th only.

EXHIBIT 1

medications.  Your staff was also told that Mr. Ray was in handcuffs because he had already tried to escape from Officer Holdar once.  Finally, your staff was present when Officer Holdar informed Mr. Ray that if he left the Hospital he would be arrested and taken to jail.

Despite this, your staff did not ask or require Officer Holdar to remain at the Hospital to help secure Mr. Ray for treatment and evaluation.  Your staff did not ask Officer Holdar to place Mr. Ray in restraints.  Your staff did not correct Officer Holdar or call into Brownsville PD to complain that Mr. Ray was a mental health patient not a criminal or inmate and, thus, could not be taken to jail without violating the Court's Emergency Detention Order.  Neither did your staff follow internal Hospital guidelines and procedures and place Mr. Ray in restraints themselves or secure him in a locked room or area.  Specifically, your staff failed to follow well-known and publicly available Hospital Rules on Restraint Use (3.1083) and Plan for Provision of Care-Psychiatric or Substance Abuse Services (3.1072).

If the Hospital was unable to secure Mr. Ray for whatever reason, the reasonable thing to have done was refuse to accept Mr. Ray and assist in getting this patient to a secure mental hospital.

When, predictably, an unsecured Mr. Ray walked out of the Hospital shortly after Officer Holdar departed, your staff including security officer Sean Lewis did not attempt to physically stop him or place him in restraints.   Instead, your staff called the police and simply followed Mr. Ray, who had wandered across the street to a row of smaller medical offices.

Police body camera video and incident reports reveal that police followed through on their threat to falsely arrest Mr. Ray instead of complying with the Emergency Detention Order.  In doing so, they broke both of Mr. Ray's arms through excessive use of force.  Despite this assault occurring across the street from the Hospital ER, the police took Mr. Ray to county jail where he spent the night without urgently needed medical care.

Police report that your employee Sean Lewis physically assisted and participated in the arrest of Mr. Ray by holding him during the officer's assault. Your employee also heard Mr. Ray screaming and moaning in pain but did not suggest or demand that officers walk him back across the street to the ER.

Discovery will no doubt reveal whether your employee informed fellow Hospital staff of what the police did to Mr. Ray. The Hospital owed a duty of care to Mr. Ray to inform Brownwood law enforcement that this patient's initial reason for involuntary commitment had in no way dissipated and that now he had life threatening physical injuries in addition. Because the Hospital did not do this, Mr. Ray spent the next three months hospitalized.

The Hospital has thus failed to meet applicable standards of care and treatment for bipolar patients in duress. There is also an easy-to-follow causal relationship between that failure and the injury, harm, or damages claimed. It was easy to foresee Mr. Ray eloping from the hospital if not secured; it was easy to foresee that Mr. Ray might resist arrest and become injured in doing so; it was easy to foresee that police would violate the Emergency Detention Order and book Mr. Ray on false charges, as well, because that is exactly what the arresting officer informed the Hospital that he intended to do.

**Please be sure to provide a copy of this letter to all business entities with whom you have any legal relationship.**

Enclosed you will find an Authorization for Release for the medical records of Trenton Ray.

If you carry medical malpractice insurance which provides, or might provide, liability insurance coverage for these claims, please direct this letter immediately to your insurance company.

Sincerely,

s/

Kevin Green


c/o:  Pam Light
plight@hendrickhealth.org